## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>　　　　　　Plaintiff,<br><br>v.<br><br>ONE PARCEL OF PROPERTY LOCATED<br>AT 5 REYNOLDS LANE, WATERFORD,<br>CONNECTICUT, WITH ALL<br>APPURTENANCES AND<br>IMPROVEMENTS THEREON,<br><br>　　　　　　Defendant.<br><br>[CLAIMANTS: SETH MARDER and<br>BETH MARDER]<br><br>　　　　　.<br> | 3:09-cv-543 (CSH) |

## RULINGS ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND CLAIMANTS' MOTION FOR AN EVIDENTIARY HEARING PURSUANT TO FRANKS V. DELAWARE

### HAIGHT, Senior District Judge:

This is an action by Plaintiff United States of America pursuant to 21 U.S.C. § 881(a)(7) to forfeit the Defendant Real Property on account of the Property's use in a violation of 21 U.S.C. § 841(a)(1). The Claimants of the Property, its owners and residents, resist forfeiture and seek an evidentiary hearing under *Franks v. Delaware*, 438 U.S. 154 (1978), into the legality of the State of Connecticut search and seizure warrant which preceded the United States' forfeiture action. The Government contends that Claimants' *Franks* application is facially without merit and no evidentiary hearing is required.

1

Two motions are presently pending before the Court.  Claimants move for a *Franks* hearing. The Government moves for a summary judgment of forfeiture under Fed. R. Civ. P. 56.  These Rulings address resolve both motions.

## I.  BACKGROUND

This factual background is drawn from the pleadings, motion papers, the Government's Local Civil Rule 56(a)1 statement and the Claimants' responses thereto, depositions of the Claimants, and other evidentiary materials in the record.  Those materials include affidavits executed by federal and state law enforcement agents to obtain the Connecticut court search and seizure warrant described *infra*.

Claimants Seth Marder and Beth Marder are husband and wife.  They were married in the State of California in 2003.  In 1996, Seth Marder had received a medical marijuana card which was valid in California, under the laws of that state.  He suffered from mental illness, and in his experience the effects of marijuana and its freedom from side effects worked better for his infirmities than prescription medications.  Seth Marder cultivated marijuana in California for his personal use, and also sold the substance to medical marijuana clubs in Alameda County, California.  By the time the Marders were married in 2003, Seth Marder had been cultivating marijuana in California under these circumstances for seven years.

The Marders moved to Connecticut in 2005.  They purchased and currently reside in a residential dwelling at 5 Reynolds Lane, Waterford, Connecticut ("the 5 Reynolds Lane Residence" or "the Defendant Property")`).  This is a single family two story wood and cement building with a detached barn-style garage.

During the week of March 9, 2009, agents of the United States Drug Enforcement Agency ("DEA") assigned to the agency's New Haven, Connecticut district office received information from an individual they designated as "CC" for "concerned citizen." This individual told the DEA agents that on or about March 10, 2009, he and another individual, a friend of the CC, were inside the Reynolds Lane Residence. The CC told the agents that the other individual purchased a quantity of marijuana from a person he identified as "Seth Marder." The CC stated further that when he and his friend entered the garage, he noticed inside that structure approximately 200 marijuana plants in various stages of growth, together with eight to ten large heating lamps.

On March 12, 2009, DEA agent Jon Rubinstein subpoenaed electricity usage records from Northeast Utilities, which furnished electrical power to houses on Reynolds Lane. These records showed that for the period of February 4, 2009 to March 5, 2009, the 5 Reynolds Lane Residence had an electricity usage balance of $755.92, while the balances for the adjoining homes at 7 Reynolds Lane and 9 Reynolds Lane for the same period were $171.42 and $169.75 respectively. Expanding the inquiry to the 10-month period just past, agent Rubinstein ascertained that the average utility bill at 5 Reynolds Lane was about $629 per month, as opposed to an $89 monthly average at 7 Reynolds Lane and a $159 monthly average at 9 Reynolds Lane. DEA agent Rubinstein involved in his inquiries detective Jeremiah E. Shea of the Waterford Police Department. These officers, both experienced in narcotics investigations, knew from that experience and additional training that the electrical equipment used to grow marijuana plants routinely produced variances in the amounts of utility bills comparable to those reflected by the Reynolds Lane residences.

Pursuing that line of inquiry, Rubinstein reviewed documents concerning real estate and appraisal information related to the 5 Reynolds Lane Residence. He ascertained that the house was

heated by oil heat, not electricity, and there was no mention of central air conditioning or a hot/tub sauna which could account for at least part of the high electrical usage revealed by the Northeast Utility bills. These findings increased the officers' reasons to believe that marijuana plants might be under cultivation in the 5 Reynolds Lane Residence.

On March 16, 2009, detective Shea conducted a surveillance of the 5 Reynolds Lane Residence. Its appearance conformed to the description of the building given by the CC to agent Rubinstein. A check of Waterford Police Department records showed that in 2006 that Department had contact with one "Seth Marder," who gave his address as 5 Reynolds Lane: that being the name of the individual given to Rubinstein by the CC as a seller of marijuana to the CC's friend on the occasion of their visit to the Residence.

On March 17, 2009, detective Shea collected garbage from a Town of Waterford garbage can located directly in front of the 5 Reynolds Lane Residence. The can contained discarded mail addressed to one or the other of the Marders at that address. It also contained an opaque, tied plastic bag which in turn contained numerous stems and leafs of a green plant-like material, twenty-one burned rolling paper butts, two small round burnt screens, a rolling paper box cover, and two cut cigar tips with cigar filler. Later on March 17, Shea subjected a portion of the plant-like substance to a frequently used chemical test which showed a positive reaction indicative of the presumptive presence of marijuana.

In these circumstances, on March 18, 2009 agent Rubinstein and detective Shea swore to affidavits in support of an application for a search and seizure warrant pursuant to Connecticut law. The affidavits and proposed warrant were presented on that day to Hon. Kevin P. McMahon, a Judge

of the State of Connecticut Superior Court.  Judge McMahon signed the warrant on that day.[1]

Law enforcement officers executed the warrant later on March 18 at the Defendant Property. Seth Marder and Beth Marder were both present at the Property.  During execution of the search warrant, approximately 100 marijuana seedling plants were discovered by law enforcement officers in the laundry room of the Defendant Property.  In the barn-style garage on the Defendant Property, the officers discovered: four clear plastic containers containing 38 clear plastic bags containing marijuana; a metal container containing approximately 2,020 grams of marijuana; an Ohaus triple beam balance scale; a wireless notebook labeled "grow diary"; and approximately 100 marijuana plants in various stages of growth.[2]

The officers arrested both Seth and Beth Marder.  Each was charged with cultivation of marijuana, in violation of Conn. Gen. Stat. § 21a-246(a); and with possession of marijuana with intent to sell, in violation of § 21a-277(b).

On April 6, 2009, the United States filed the complaint in the case at bar [Doc. 1].  The Government chose not to indict and prosecute either of the Marders personally.  Instead, the government instituted this civil *in rem* forfeiture action against 5 Reynolds Lane, the sole party defendant.  The Marders appear only as Claimants of the Property.  They answered the complaint on June 11, 2009 {Docs. 13, 14].  By Order dated June 6, 2009 [Doc. 17], the Court stayed proceedings in this civil case pending resolution of the criminal charges against the Marders.

---

[1]   The contents of the five preceding paragraphs in text are based principally upon the affidavits of DEA agent Rubinstein and Waterford detective Shea that were presented to Superior Court Judge McMahon.  [Doc. 30-1].

[2]   The contents of this paragraph are taken from the government's Local Rule 56(a)1 Statement at ¶¶ 6-7.  Claimants do not dispute any of those assertions, and so the Court accepts these facts as accurate.

It appears from the Government's brief on its present motion for a summary judgment of forfeiture [Doc. 33-1] and its uncontested Rule 56(a)1 statement [Doc. 34] that Seth Marder pled guilty in the Connecticut criminal case to a felony charge of illegal cultivation of marijuana. As part of plea negotiations, Beth Marder was not convicted of any criminal drug offense with respect to the marijuana cultivation taking place on the Defendant Property. These dispositions are also described in the depositions of the Marders taken by the Government in the instant civil case.

Activity in this civil action resumed on March 28, 2010, with the filing of a scheduling order and status report [Doc. 21]. Depositions taken during the summer of 2011 by counsel for Claimants serve to identify the "CC" (concerned citizen) and his "friend" referred to in the Rubinstein and Shea affidavits in support of the search warrant signed by Judge McMahon in March 2009. Specifically, counsel ascertained that the "concerned citizen" is a man named Jeffrey Pearson, and his "friend" is his uncle, a man named Mike Clark, whose father is Pearson's grandfather. Counsel for Claimants deposed both Pearson and Clark. Claimants now contend that the account given by Pearson to law enforcement officers in March 2009, as recounted in the Rubinstein and Shea affidavits, was replete with inaccuracies to an extent that the warrant based upon those affidavits is constitutionally infirm. In these circumstances, Claimants move for a *Franks* hearing to explore and establish that contention. [Doc. 31].

For its part, the Government moves for summary judgment on its forfeiture action against the Defendant Property. [Doc. 33]. Each party opposes the other's motion. Claimants contend that the Government's summary judgment motion cannot be considered until their *Franks* hearing is completed, which Claimants hope would result in a ruling that the 2009 search warrant was invalid and all the fruits of the search must be precluded. The Government contends that no *Franks* hearing

is required, and the case is ripe for summary judgment in the government's favor.

I consider these two motions in that order.

## II.  CLAIMANTS' MOTION FOR A <u>FRANKS</u> HEARING

In the often contentious world of search and seizure warrants, the phrase "*Franks* hearing" takes its name from the Supreme Court's decision in *Franks v. Delaware*, 438 U.S. 154 (1978).  That case arose out of the defendant-petitioner Franks' state court conviction for rape, kidnaping and burglary.  Pursuant to warrant, police in Dover, Delaware searched petitioner's apartment and seized articles of clothing and a knife, all of which were introduced in evidence at trial.  Prior to trial, defense counsel had moved to suppress that evidence on the grounds that the warrant on its face did not show probable cause, and that the veracity of the warrant affidavit was subject to challenge: specifically, that material misstatements of fact "were included in the affidavit not inadvertently, but in 'bad faith.'" 438 U.S. at 158.  On that second ground, defense counsel sought an evidentiary hearing in order to examine the police officers who were involved in the preparation of the affidavit on which the warrant was based.  The state court denied the motion, declined to hold an evidentiary hearing, and admitted the seized items into evidence at trial, which resulted in defendant's conviction, subsequently affirmed by the state supreme court.

The United States Supreme Court granted certiorari to the defendant-petitioner on "the issue whether the trial court had erred in refusing to consider his allegation of misrepresentation in the warrant affidavit." 438 U.S. at 161 (footnote omitted).  The Court reversed the state supreme court and remanded the case for further proceedings.  Justice Blackmun summarized the Court's holding at 438 U.S. 153-154, which it is instructive to quote at length:

We reverse, and we hold that, where the defendant makes a substantial preliminary holding that a false statement *knowingly or intentionally*, or *with reckless disregard for the truth*, was included *by the affiant* in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request. In the event that at that hearing *the allegation of perjury or reckless disregard* is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit.

(emphases added).

The emphasized phrases in this quotation from *Franks* make it clear that such cases turn upon the veracity of "*the affiant*" who swears to the affidavit upon which the independent and neutral magistrate issues a warrant. That principle is further revealed by the Court's continuing analysis in *Franks*:

When the Fourth Amendment demands a factual showing sufficient to comprise "probable cause," the obvious assumption is that there will be a *truthful* showing. This does not mean "truthful" in the sense that every fact recited in the warrant affidavit is necessarily correct, for probable cause may be founded upon hearsay and upon information received from informants, as well as upon information within the affiant's own knowledge that sometimes must be garnered hastily. But surely it is to be "truthful" in the sense that the information put forth is believed or appropriately accepted by the affiant as true. . . . Because it is the magistrate who must determine whether there is probable cause, it would be an unthinkable imposition upon his authority if a warrant affidavit, revealed after the fact to contain a deliberately or reckless false statement, were to stand beyond impeachment.

438 U.S. at 164-165 (citations and internal quotation marks omitted). The "deliberately or reckless false statement" the Court contemplated in *Franks* is that of an affiant, invariably a law enforcement

8

officer, who prepared the affidavit upon which a magistrate issued a warrant.  Lest there be any uncertainty on that score, the Court concluded its opinion in *Franks* by saying: "The deliberate falsity or reckless disregard whose impeachment is permitted today is only that of the affiant, not of any nongovernmental informant."  *Id.* at 171.

The Second Circuit applied this limitation on the availability of a *Franks* hearing in *United States v. Campino*, 890 F.2d 588 (2d Cir. 1989).  During an investigation into a possible narcotics conspiracy, federal agents obtained a warrant to search an apartment they mistakenly believed to be occupied by one Taylor-Lopez, a suspect.  Search of the apartment led to drug records which incriminated the defendants in the case, who had not known Taylor-Lopez and recently moved into the searched apartment.  Prior to their trial, defendants moved the district court for a *Franks* hearing concerning the search.  The Second Circuit, affirming the district court's refusal to hold a hearing, said: "The trial court denied the request for a *Franks* hearing because appellants failed to produce evidence of deliberate falsehood or recklessness in the affidavit."  890 F.2d at 592.  The court of appeals continued: "Even though the agents turned out to be wrong about who lived in the apartment, that fact alone w  as insufficient to mandate a *Franks* hearing," and added in explanation: "*Franks* does not require that all statements be true; it simply requires that the statements be 'believed or appropriately accepted by the affiant as true.'" *Id*. (citing and quoting *Franks*).  The Second Circuit observed that not only had the appellants failed to produce any evidence of deliberate falsehood or recklessness *on the part of the agents who wrote the affidavit* (the relevant inquiry under *Franks*), "the affidavit contained sufficient information to support the agents' belief that Taylor-Lopez used the Keel Court apartment."  That information was generated by the agents' surveillance of activities at the apartment, inquiries of neighbors, and observations of certain automobiles parked nearby.  *Id*.

9

On the basis of the Supreme Court's holding and reasoning in *Franks,* and that case's application by the Second Circuit in cases such as *Campino,* I conclude without difficulty that the Claimants are not entitled to a *Franks* hearing in the case at bar. Their motion does not even pretend to identify, let alone support by proof, any deliberately or recklessly false statement made by agent Rubinstein or detective Shea in the affidavits they presented to Judge McMahon in March 2009. Nor do Claimants offer any proof that when they prepared those affidavits to obtain the warrant, either officer knew the statements made to them by Pearson or Clark were false in any way, or that the officers recklessly disregarded untruthfulness.

On the contrary: Claimants' motion for a *Franks* hearing is generated by and totally dependent upon depositions of Pearson and Clark that Claimants' counsel took in 2011, on the basis of which Claimants now argue that the account given to the officers, principally by Pearson, was in certain respects untrue. I need not explore those perceived discrepancies in detail. Assuming without finding or deciding that Pearson's description of events to law enforcement contained inaccuracies in the particulars alleged, Claimants submit no proof that Rubinstein or Shea knew or had reason to know of the inaccuracies when they presented their affidavits in 2009. Under the holding in *Franks* and its progeny, after-acquired knowledge (acquired in this case in 2011) of any inaccuracies in Pearson's description to law enforcement in 2009 of just-occurred events at the Defendant Property is not relevant to the conduct of the law enforcement affiants who applied for a warrant at that earlier time. The Second Circuit enforced that distinction in *United States v. One Parcel of Property Located at 15 Black Ledge Drive, Marlborough, Connecticut*, 897 F.2d 97, 101 (2d Cir. 1990), affirming the denial of a *Franks* hearing: "Since appellant failed to make the requisite preliminary showing of false or reckless disregard under *Franks*, we need not go on to consider, as

10

the district court subsequently did, whether there remained sufficient content in the warrant affidavit to support a finding of probable cause, even disregarding the statements claimed to be untrue."[3]

In addition, one may legitimately consider the corroborating evidence that these law enforcement agencies compiled and included in the officers' affidavits before applying to Judge McMahon for a warrant. It is important to recall that Pearson, the unnamed "CC" or "concerned citizen," dropped out of the blue when he telephoned DEA agents at the New Haven office and told them that he had very recently been at the Defendant Property; that people named Marder lived there; and that he had witnessed marijuana being cultivated on the premises and a sale of marijuana to another individual take place. This CC was not a familiar and trusted source of information for the DEA; he was a total stranger. It is noteworthy, then, that the federal and local police agencies did not simply take an unknown CC's word for it and apply forthwith for a warrant to search the Property. Instead, they meticulously gathered corroborating evidence. That evidence consisted of neighborhood electrical usage bills strongly suggestive of marijuana cultivation at the suspect Property; real estate documents showing that a man named Marder (the name given by the resident to the CC) lived at the Property; surveillance of the Property, whose physical description tallied with that given to DEA agents by the CC; and the residue of marijuana plants found in a garbage can in

---

[3] Since in the case at bar the Claimants totally fail to make "the requisite preliminary showing of false or reckless disregard" on the part of the law enforcement officers whose affidavits supported the warrant, a *Franks* hearing cannot be mandated on the ground of the truth or falsity of certain aspects of the account the officers attributed to Pearson, who tipped them to the presence of marijuana at the Defendant Property. But I note in passing the Government's brief [Doc. 38] at 10, pointing out that during his deposition Pearson described three separate occasions when he went to 5 Reynolds Lane in connection with the purchase of marijuana from the Marders. These recitations by Pearson allow the Government to argue in its brief at 10 without contradiction: "The substance of [warrant affidavit] paragraph 4, that Pearson had been on the premises and had obtained marijuana from the Claimants, does not negate or conflict with his deposition testimony."

front of the Property.  It is difficult to imagine what more the officers could have done to corroborate the CC's statement that marijuana plants were being cultivated by the residents of a house at 5 Reynolds Lane, in the Town of Waterford, State of Connecticut.

All this evidence was set forth in detail in the affidavit presented to Judge McMahon, who issued the warrant after concluding (perhaps, I may presume to say, without difficulty) that probable cause existed to believe that a search of the Property would result in the discovery of the presence and cultivation of marijuana.  It may also be noted that this is precisely the sort of corroborating evidence that the Second Circuit cited in affirming the denial of a *Franks* hearing in *Campino*.

For these reasons, the Court will deny the Claimants' motion for an evidentiary hearing under *Franks v. Delaware.*

## III.   THE GOVERNMENT'S MOTION FOR SUMMARY JUDGMENT

### A.   <u>Standard of Review</u>

The Government moves for summary judgment in its *in rem* action for forfeiture against the Defendant Property.

Summary judgment is appropriate "where the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law."  Fed R. Civ. P. 56(c)(2).  Under the Rule, the party moving for summary judgment has the burden of showing the absence of any genuine issue of material fact.  *Adickes v. Kress & Co.*, 398 U.S. 144, 157 (1970).  A fact is material when its resolution would "affect the outcome of the suit under governing law." A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the

nonmoving party." *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248 (1986). *See also General Electric Co. v. New York State Department of Labor*, 936 F.2d 1448, 1452 (2d Cir. 1991).

When ruling on a summary judgment motion, the court must construe the facts in evidence in the light most favorable to the nonmoving party. It must also resolve all ambiguities and draw all reasonable inferences against the moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 255.

"Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir. 1991). A nonmoving party must therefore present affirmative evidence in order to defeat a properly supported motion for summary judgment. When "a motion for summary judgment is properly supported by documentary and testimonial evidence ... the nonmoving party may not rest upon the mere allegations or denials of his pleadings, but rather must present significant probative evidence to establish a genuine issue of material fact." *Marczeski v. Gavitt*, 354 F.Supp. 2d 190, 193 (D. Conn. 2005) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 327 (1986)). To present a "genuine" issue of material fact, there must be contradictory evidence "such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Scott v. Harris*, 550 U.S. 372. 380 (2007) (citing and quoting *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-587 (1986)). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott*, 550 U.S. at 380 (reversing Eleventh Circuit's denial of summary judgment:

"Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him.  The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape.").

As a general rule, evidentiary material submitted to support or oppose a motion for summary judgment under Rule 56 must be admissible at a trial for a court to consider it in determining whether to grant or deny the motion.  That requirement is made explicit by the language of the Rule.  Rule 56(c)(1) provides that "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . ."  Rule 56(c)(4) provides: "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."

Should the nonmoving party fail to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof, summary judgment against him is appropriate.  *Celotex Corp. v. Catrett,* 477 U.S. at 322.  A "complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  *Id.* at 322-23.  "The mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Scott v. Harris,* 550 U.S. at 380 (emphases in original) (citing and quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248).  If the nonmoving party submits evidence that is "merely colorable," summary judgment may be granted.  *Anderson v. Liberty Lobby, Inc.*, 477

14

U.S. at 249-50.

**B.**     <u>**Discussion**</u>

The intractable nature of violations of the nation's narcotics laws is reflected by the fact that *in rem* actions by the United States to forfeit real property used in a drug violation are commonplace and nation-wide.

In this Circuit, when claimants of real property contest the Government's right to forfeiture, the preferred protocol for resolving the issue is the two-step procedure fashioned by Judge Kravitz of this Court in *United States v. One Parcel of Property Located at 32 Medley Lane, Branford, Connecticut*, 372 F.Supp.2d 248 (D. Conn. 2005), *aff'd. in part and rev'd. in part sub nom. von Hofe v. United States*, 492 F.2d 175 (2d Cir. 2007).  I will follow that procedure in the governance of the case at bar.

In *von Hofe*, the real property in question, at 32 Medley Lane, was "a modest ranch-style house situated on a relatively small, wooded lot in a residential area of Branford, Connecticut, a suburban community located outside of New Haven."  372 F.Supp.2d at 252.  Harold and Kathleen von Hofe, a married couple, had lived in the house for twenty-seven years and raised their three children there.  Acting on a tip, local police and DEA agents executed a search warrant in the house and seized 65 marijuana plants " in various stages of growth from seedlings to full grown plants," located in two "grow areas" in the house: "behind a curtain under the stairs leading to the basement and to another curtained area behind a furnace oil tank." *Id*.  The searching officers seized the plants, and items of equipment used in the growing and cultivation of marijuana also found in the house. *Id.* at 252-253.  The Government brought an *in rem* action seeking forfeiture of the house to the Government.  Mr. and Mrs. von Hofe appeared in the action as claimants of the defendant property

and contested the Government's right to forfeiture.

The facts in *von Hofe* resemble rather closely those in the case at bar, and the governing statutes are identical. Those statutes are: the Controlled Substances Act, codified at 21 U.S.C. § 801 *et seq.* ("CSA"); and the Civil Asset Forfeiture Reform Act of 2000, codified at 18 U.S.C. § 981 *et seq.* ("CAFRA"). The CSA, 21 U.S.C. § 881(a)(7) permits forfeiture to the United States of "[a]ll real property . . . which is used . . . to commit, or to facilitate the commission of, a violation of the [Comprehensive Substances Act] punishable by more than one year's imprisonment." CSA § 841(a) provides that "it shall be unlawful for any person knowingly or intentionally . . .to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance." Marijuana is a controlled substance. "To manufacture" marijuana means, in more common parlance, to grow and cultivate marijuana plants. Under the statutory scheme, whether such conduct is punishable "by more than one year's imprisonment" depends upon the weight of the marijuana involved or the number of plants under cultivation.

Under CAFRA, 18 U.S.C. § 983(c)(1), "the burden of proof is on the Government to establish, by a preponderance of the evidence, that the property is subject to forfeiture." "To carry its burden of proving the property facilitated a narcotics offense punishable by more than one year in prison, the government must 'establish that there was a substantial connection between the property and the offense.'" *von Hofe*, 492 F.3d at 180 (citing and quoting CAFRA, 18 U.S.C. § 983(c)(2)). "To prevent forfeiture, a claimant may either rebut the government's proof of a substantial connection or raise an innocent owner defense under CAFRA." *Id.* CAFRA requires a claimant to prove by a preponderance of the evidence that he or she is "an innocent owner," as that phrase is defined by the statute. §§ 983(d)(1), (2).

16

When a proposed forfeiture to the United States is contested by a property claimant, the dispute may be resolved by summary judgment, or if a summary disposition is not appropriate, by a jury trial. Jury trials are available in civil forfeiture cases under CSA § 881(a)(7), notwithstanding the presence of the Sovereign as Plaintiff. In *von Hofe* a trial took place, which Judge Kravitz conducted in two steps, for the reasons he explained in a Ruling reported at 2005 WL 465421 (D.Conn. Feb. 11, 2005). First, the Court held a jury trial focused on two issues. "One issue was whether the Property was subject to forfeiture under 21 U.S.C. § 881(a)(7)," on which "CAFRA required the Government to prove by a preponderance of the evidence that there was a substantial connection between the Property and a violation of federal narcotics laws punishable by more than one year's imprisonment." 372 F.Supp.2d at 250. "The second issue presented to the jury was whether Claimant Kathleen von Hofe was an 'innocent owner' under CAFRA." *Id.* at 251. After hearing evidence, the jury found in the Government's favor on both issues. "The jury returned a verdict explicitly finding that the Government had satisfied its burden of establishing that the Property was subject to forfeiture and that Mrs. von Hofe had not shouldered her burden of proving that she was an innocent owner." *Id.*

Judge Kravitz discharged his jury and took additional evidence on a third issue: whether forfeiture of the Property was constitutional, a question that arose under the Excessive Fines Clause of the Eighth Amendment to the Constitution. On that aspect of the case, Judge Kravitz chose to follow Ninth Circuit authority for the proposition that "the Court should make the determination of whether the forfeiture is excessive under the Eighth Amendment, not the jury." 2005 WL 465421, at *1 (citations and internal quotation marks omitted). That procedure seems to me entirely correct, and the Government appears to agree, stating in fn. 1 to its brief [Doc. 33-1] that "Claimant's

17

assertion that forfeiture of the Defendant [Property] *in rem* violates the Eighth Amendment is premature as it is a post-forfeiture remedy" (citing Judge Kravitz's ruling in *von Hofe*, 2005 WL 465421).

On an appeal limited to the constitutionality of forfeiture of the property, the Second Circuit affirmed the forfeiture of Mr. von Hofe's interest in 32 Medley Lane, "but not the forfeiture of Mrs. von Hofe's interest.  Because the extent of the forfeiture bears no correlation either with Mrs. von Hofe's minimal culpability or any harm she purportedly caused, the Excessive Fine Clause precludes forfeiture of her entire one-half interest in 32 Medley Lane."  492 F.3d at 178-179.

Returning to the case at bar, this Court is now called upon to decide whether the Government is entitled to summary judgment on the first two of these three issues frequently presented by civil forfeiture cases: (1) Is the Defendant Property at 5 Reynolds Lane subject to forfeiture to the United States?  (2) Is Claimant Beth Marder an innocent owner of that Property?  I discuss these issues separately.

### 1.  <u>Forfeiture of the Defendant Property</u>

The Government bears the burden of proving by a preponderance of the evidence that the property at 5 Reynolds Lane "is subject to forfeiture."  CAFRA, 18 U.S.C. § 983(c)(1).  Where, as here, "the Government's theory of forfeiture is that the  property was used to commit or facilitate the commission of a criminal offense, or was used in the commission of a criminal offense, the Government shall establish that there was a substantial connection between the property and the offense."  § 983(c)(3).  Those sub-sections, read together and applied to the case at bar, require the Government to prove by a preponderance of the evidence that a substantial connection existed between the property at 5 Reynolds Lane and the offense of manufacturing marijuana, a controlled

substance, in violation of the CSA, 21 U.S.C. § 841(a)(1).

The Government's proof on that issue comes from a number of sources, including the Claimants themselves.  The Claimants' Local Rule 56(a)2 Statement says at ¶ 3:

> Seth Marder admits that prior to March 18, 2009, he was "engaged" in the growing of marijuana at the Defendant Property for his own medically related personal use.  Beth Marder admits that prior to March 18, 2009, she helped Seth Marder in the growing of marijuana for her personal use related to her chronic Lyme Disease.

The Claimants further admitted that during the police search of the Property on March 18, 2009, "approximately 100 marijuana seedling plants were discovered by law enforcement in the laundry room of the Defendant Property."  *Id*. at ¶ 6.  They also admitted, in response to ¶ 7 of the Government's Rule 56(a)(1) Statement, that in "the barn-style garage on the Defendant Property" the officers discovered various items of equipment containing marijuana and "approximately 100 marijuana plants in various stages of growth": presumably, different plants from the 100 "seedling plants" found in the laundry room of the Property, referred to in the preceding paragraphs of Claimants' Rule 56(a)(2) Statement.  Comparable admissions are found in the depositions of both Claimants, taken by the Government in this action.

In addition, the Government's brief [Doc. 33-1] states without contradiction that following his arrest at the Defendant Property on March 18, 2009, Seth Marder "pled guilty in state court to one count of illegal cultivation of marijuana" in violation of the Connecticut statute, a plea consistent with the Claimants' admissions in the case at bar that they grew marijuana at the Property.

This evidence makes it unnecessary for the Government to rely upon the testimony of the two witnesses, Pearson and Clark, about the events at the Property that led to Pearson's "concerned citizen" tip to the DEA.  Any inconsistencies in Pearson's account are of no moment in the resolution

of the present question, which is whether there was a connection between the 5 Reynolds Lane property and the offense of the manufacture of marijuana. The record includes the Claimants' own acknowledgments that they grew marijuana at the Property. That is sufficient, to state the obvious, to establish a connection between the property and the offense.

The Claimants oppose summary judgment on the issue of whether the Defendant Property is subject to forfeiture. It is difficult to follow their argument. Claimants concede, as they must, that § 841(a)(1) of the CSA makes it illegal "to manufacture" a "controlled substance"; that marijuana is a controlled substance; and that the CSA, § 841(b)(1)(D), "provides that the cultivation of 50 or more marijuana plants is also punishable by more than one (1) year in prison." Claimants' brief [Doc. 40] at 4. As noted *supra*, Claimants' admissions establish each of these elements. They acknowledge growing marijuana plants at the Defendant Property, and the law enforcement officers found about 200 plants under cultivation in the house and the garage during the March 18, 2000 search. Nonetheless, Claimants insist that summary judgment for the Government is inappropriate, and there must be a trial, for this reason, as stated their brief at 4:

> It is our position that the history and background of how and why the Marders had the marijuana plants in their home is relevant in terms of a jury deciding whether Seth Marder or Beth Marder manufactured the plants or simply were in possession of the marijuana plants for their own use.

The use to which the Marders put the marijuana they grew was, according to their accounts, medicinal in nature: by Seth Marder, for mental and psychological conditions; by Beth Marder, for chronic Lyme disease.

Within the present summary judgment context, one may accept the factual premises that the Marders consumed virtually all of their marijuana crops themselves, and that they did so for medical

20

or medicinal reasons. It makes no difference. Those facts are not relevant to the theory upon which

the Government seeks forfeiture of the Defendant Property. In the parlance of Rule 56, any disputes

over these assertions of use by the Claimants would not relate to *material* facts.

As for the Claimants' *manufacture* of marijuana: While § 844 of the CSA makes the "simple

possession" of a controlled substance punishable only as a misdemeanor, § 841(a)(1)'s prohibition

of the "manufacture" of marijuana, punishable as a felony, does not distinguish between marijuana

intended for personal use and for sale or distribution to others. A typical judicial decision on point

is *United States v. Premises and Real Property at 250 Kreag Road*, 739 F.Supp. 120 (W.D.N.Y.

1990). The claimant of the property in question argued that "he did not 'manufacture' marijuana on

the premises within the meaning of the statute, for he grew the plants solely for his own medicinal

use, rather than with the intent to distribute it for commercial gain." *Id*. at 124. Judge Larimer

rejected that argument, reasoning that:

> It is by now well established that the proscription of the
> "manufacture" of controlled substances contained in § 841
> criminalizes the growing of marijuana. It has also been held that in
> order to prove a "manufacturing" violation of § 841, the Government
> need not show that the drug was grown with the intent to
> commercially distribute it; proof of cultivation for personal use will
> suffice.
>
> Congress clearly distinguishes between mere possession for
> personal use and its actual manufacture, or cultivation, for that
> purpose. Title 21 U.S.C. § 844 makes simple possession for personal
> consumption a misdemeanor, while § 841 classifies manufacture, for
> whatever purpose, a felony. I therefore find it to have been Congress'
> intention in enacting § 881(a)(7) that the use to which Saurini put his
> property would subject it to forfeiture under that provision.
>
> For these reasons, I find that Saurini has not shown the existence of
> any issue of material fact regarding his unlawful use of the property.

*Id*. (citations omitted).  The First Circuit reached the same conclusions in *United States v. One Parcel of Real Property*, 960 F.2d 200, 205 (1ˢᵗ Cir. 1992):

> We hold unhesitatingly, joining other courts that have formed the same conclusion, that marijuana grown for personal use is within the reach of section 841(a).  Moreover, since violations of section 841(a) are felonies punishable by more than one year in prison, *see* 21 U.S.C. § 841(b), we also hold that growing marijuana, whether or not for personal use, is an activity sufficient to subject the property on which cultivation occurs to civil forfeiture under section 881(a)(7).

(citations omitted).  These principles have not been altered by subsequent decisions.  The Claimants at bar cite no authority to the contrary.  The passage from Judge Kravitz's jury charge in *von Hofe*, which Claimants quote in their brief at 3, cannot reasonably be read to declare a different rule of law.

As for Claimants' assumed use of the marijuana for *medical* or *medicinal* reasons: This can have no effect upon the Defendant Property's vulnerability to forfeiture, in view of the guidance furnished by the Supreme Court's decisions upholding the supremacy of the federal Controlled Substances Act over California's Compassionate Use Act, which expressly authorized the use of marijuana for medical purposes.  In *United States v. Oakland Cannabis Buyers' Cooperative*, 532 U.S. 483 (2001), the Court held that there is no medical necessity exception to the Controlled Substance Act's prohibitions on manufacturing and distributing marijuana, so that those prohibitions covered even those who, under the terms of the California statute, had what could be termed a medical necessity for use of marijuana.  In *Gonzalez v. Raich*, 545 U.S. 1 (2005), the Court held that under the Commerce Clause of the Constitution, Congress had the power "to prohibit the local cultivation and use of marijuana in compliance with California law," *id.* at 5, so that the CSA "may validly be applied to respondents' cultivation, distribution, and possession of marijuana for personal,

medicinal use." Scalia, J., concurring in the judgment, *id.* at 33.  For a recent and instructive review of the tension existing between federal and California laws governing marijuana use, *see Marin Alliance for Medical Marijuana v. Holder*, No. C 11-05349, 2012 WL 2862608 (N.D. Cal. July 11, 2012).

These decisions do not bear directly upon the case at bar, since Connecticut does not have a statute similar to California's Compassionate Use Act.  On the contrary: Connecticut's statutes criminalize the cultivation of marijuana, and Seth Marder pleaded guilty in a Connecticut court for violating their terms.  I include this discussion only to demonstrate that there is no substance to any suggestion the claimants may be making that their use of their marijuana for medicinal purposes is relevant to or has any effect upon the question of whether the Defendant Property is subject to forfeiture.  Forfeiture of real property pursuant to 21 U.S.C. § 881 is a part of the CSA, which as the cited cases hold makes no exceptions for and extends no forbearance to the use of marijuana for medical or medicinal purposes.

Lastly on this subject: Claimant's brief at 2-3 cites and discusses, for no discernible reason, the Second Circuit's opinion in *United States v. Williams*, 247 F.3d 353 (2d Cir. 2001).[4]  *Williams* concerned the proper calculation of the amount of drugs to be included in calculating the length of the sentence to be imposed after the defendant's conviction for the possession of cocaine with intent to distribute.  The Second Circuit held that "in sentencing defendants convicted of possession with intent to distribute, drugs meant only for personal use must be excluded from the drug quantity assessment." *Id*. at 355.  The court of appeals reasoned: "The case would be different if the charge

---

[4] Mis-cited in Claimants' brief as decided in 2011, rather than in 2001, the year of decision.

were conspiracy rather than possession. . . . Where, instead, there is no conspiracy at issue, the act of setting aside narcotics for personal consumption is not only not a *part* of a scheme or plan to distribute these drugs, is actually *exclusive* of any plan to distribute them." *Id*. at 358 (citation and footnote omitted; emphases in original).

Claimants say in their brief at 2: "If the government were proceeding under the theory that either Seth or Beth Marder possessed the marijuana with intent to distribute it," the Second Circuit's decision in *Williams* "would become relevant."  Well, yes, one can agree with that, but the Government is *not* charging the Marders with an intent to distribute their marijuana, and so *Williams* is *not* relevant, either in its holding or its rationale.  The authorities relevant to this Ruling are cited and discussed *supra*.

In the light of those authorities, there is no substance to the Claimants' contention, previously quoted,  that summary judgment is inappropriate and that a jury should decide "whether Seth Marder or Beth Marder manufactured the plants or simply were in possession of the marijuana plants for their own use. " There are two problems with that sentence.  First, there is no need for a jury to decide whether the Marders "manufactured" their plants because they both admit to having done so.  Second, the  assumed fact that the marijuana was "for their own use" is irrelevant to the question of whether the Defendant Property is subject to forfeiture.

For the foregoing reasons, summary judgment on the forfeiture issue will be entered in favor of the Government.

### 2.  Innocent Owner

The Government argues in its brief that Beth Marder cannot be regarded as an "innocent owner," as that phrase is used in the governing law.  It is not clear that the Claimants assert such a

claim, but if they do, the Government is entitled to summary judgment rejecting it.

The concept of an "innocent owner" is codified in the CAFRA statute, which provides in 18 U.S.C. § 983(d)(1): "An innocent owner's interest in property shall not be forfeited under any civil forfeiture statute.  The claimant shall have the burden of proving that the claimant is an innocent owner by the preponderance of the evidence."

§ 983(d)(2)(A) provides that with respect to a property interest "in existence at the time the illegal conduct giving rise to forfeiture took place, the term 'innocent owner' means an owner who (I) did not know of the conduct giving rise to forfeiture; or (ii) upon learning of the conduct giving rise to the forfeiture, did all that reasonably could be expected under the circumstances to terminate such use of the property."

To comprehend that Beth Marder cannot make either showing with respect to the Defendant Property at 5 Reynolds Lane, one need look no farther than her responses to the Government's Local Rule 56(a)1 Statement [Doc. 39].  ¶ 3 of Claimants' response recites: "Beth Marder admits that prior to March 18, 2009 [the date of the search], she helped Seth Marder in the growing of marijuana for her personal use related to her chronic Lyme Disease."  See also ¶¶ 10, 11, and 17: "Beth Marder knew that growing marijuana was illegal."  "Seth and Beth Marder packaged marijuana at the Defendant property for their personal use."  "Beth Marder knew that there was marijuana growing at the Defendant property."  Similar admissions are found in Beth Marder's deposition; it is unnecessary to recount them.  Beth Marder is not in a position to make either of the showings CAFRA requires to qualify as an "innocent owner" of property subject to forfeiture.  Her defensive position is quite different, and is discussed *supra*.  Summary judgment in favor of the Government will be entered on the issue of whether Beth Marder is an innocent owner of the Defendant Property.

## C.   Constitutional Question

For the foregoing reasons, in the case at bar the Government prevails by summary judgment on the two issues it prevailed upon by a jury verdict in *von Hofe*: the Defendant Property is subject to forfeiture, and the defense of innocent owner is not available.

As in *von Hofe*, the Court will consider separately the question whether the Excess Fine Clause of the Eighth Amendment bars forfeiture of both or either Claimant's interest in the Property. That question has not yet been briefed by counsel, and counsel may suggest additional evidence that it wishes to present with respect to it.

## IV.   CONCLUSION

The motion of Claimants Seth Marder and Beth Marder for an evidentiary hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), is DENIED in all respects.

The motion of the Plaintiff United States of America for summary judgment is GRANTED. Counsel for Plaintiff are directed to file and serve, on or before October 14, 2012, a proposed Judgment in a form and substance consistent with this Ruling.  If so advised, counsel for the Claimants Seth Marder and Beth Marder may file and serve a counter-Judgment on or before October 21, 2012.

Counsel for the parties are directed to file and serve, on or before October 14, 2012, written submissions stating whether they wish to offer further evidence with respect to the constitutional question in the case.  If additional evidence is sought to be adduced, the proponent of the evidence is directed to submit a detailed offer of proof, describing in detail the nature of the evidence and its source.

26

Following such submissions, the Court will by further Order set a schedule for the taking of any additional evidence and final briefing.

It is SO ORDERED.

New Haven, Connecticut
October 3, 2012

*/s/Charles S. Haight, Jr.*
Charles S. Haight, Jr.
Senior United States District Judge